AO 9, (Rev. 08/09) Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Northern District of California

| United States of America | ) | |
|---|---|---|
| v. | ) | Case No. |
| JONATHAN EDWARD MILLS | ) | 3-14-70160 |
| *Defendant(s)* | ) | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of __November 27, 2013__ in the county of __San Francisco__ in the __Northern__ District of __California__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| Title 18, United States Code, Section 1343 | Wire Fraud |

This criminal complaint is based on these facts:

SEE ATTACHED AFFIDAVIT

✓ Continued on the attached sheet.

*Complainant's signature*

Brian C. Weber / Special Agent, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 2/7/2014

*Judge's signature*

City and state: San Francisco, California

United States Magistrate Judge Maria-Elena James
*Printed name and title*



# AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT AND ARREST WARRANT

I, Brian C. Weber, being first duly sworn, hereby depose and state as follows:

## A. INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of a Criminal Complaint and Arrest Warrant against JONATHAN EDWARD MILLS. As set forth below, there is probable cause to believe MILLS has committed wire fraud, in violation of Title 18, United States Code, Section 1343.

2. I am a Special Agent of the Federal Bureau of Investigation (FBI), and I have been so employed for approximately 12 years. I am currently assigned to the San Francisco Division of the FBI. As part of my assigned duties, I investigate possible violations of federal criminal law. Since joining the FBI, I have been assigned to squads in San Francisco that focus on the investigation of white collar crimes, public corruption, and civil rights violations. I also served for approximately eighteen months as an Supervisory Special Agent in the Financial Crimes Section at FBI Headquarters in Washington, D.C., where I oversaw complex financial crimes investigations across the nation. During my career as an FBI agent, I have participated in hundreds of white collar crime investigations, and I have been the lead or co-lead agent in more than 50 such investigations. I served as a criminal prosecutor for the Cook County Assistant States Attorney's Office in Chicago, Illinois, for approximately 3 years prior to joining the FBI.

3. This affidavit is based on my personal knowledge and information obtained from documents, witnesses, and other law enforcement officials. The information contained in this affidavit is submitted for the limited purpose of establishing probable cause in support of a criminal complaint and arrest warrant against MILLS. As such, this affidavit does not include all of the information that I have acquired while participating in this investigation.

## B. PROBABLE CAUSE TO BELIEVE CRIMES HAVE BEEN COMMITTED

4. MILLS is the founder and former Chief Executive Officer (CEO) of Motionloft, a technology company located in San Francisco, California. Motionloft produces and installs sensors that provide real-time and historical analytical information regarding pedestrian traffic and vehicle traffic. MILLS served as the CEO of Motionloft from its founding in 2010 until on or about December 1, 2013, when he was removed by the action of the majority of Motionloft's stockholders.

5. Victim "JD" (these are the initials of the victim, not the victim's real name) informed me that JD first met MILLS in or about September 2011. JD is a physician specializing in housecall services for patients in the San Francisco Bay Area, and first met MILLS in response to MILLS's request for medical services. JD became familiar with MILLS through medically related visits between September 2011 and November 2013. MILLS often discussed Motionloft with JD and his role as CEO of Motionloft. On or about November 15, 2013, MILLS told JD that Cisco Systems, Inc., a California-based technology company, was in the process of purchasing

1

Motionloft for $760,000,000 and that Cisco had already provided Motionloft with a non-refundable good faith ten percent payment of $76,000,000.

6. MILLS contacted JD via text message on November 27, 2013. JD provided me with a printout of text messages he exchanged with MILLS between November 15, 2013, and December 31, 2013, which I have reviewed On November 27, 2013, MILLS sent the following text to JD "I set aside some shares for you a long time ago but wasn't sure I could get them to you," followed by "Are you interested." JD responded to MILLS texting "Really? Of course. That was awfully sweet of you," to which MILLS responded "I couldn't set aside advisory, but you can "invest" for two weeks if you're interested." JD then texted MILLS asking "Do you advise me to?" to which MILLS responded "Closing is December 13th so yea obviously lol." JD was in Florida at the time he exchanged the above text messages with MILLS and throughout much of their ensuing telephone and text message conversations regarding JD's investment in Motionloft.

7. JD communicated with MILLS about JD's investment in Motionloft several times via text and telephone on and around November 27, 2013. MILLS promised JD a three percent equity stake in Motionloft in exchange for a total investment of $400,000. On November 27, 2013, JD was only able to obtain $210,000 through his personal funds and loans from his family for the Motionloft investment. MILLS told JD that the entire $400,000 in funds were required to secure the investment that day, and told JD that while it was a little "un-kosher" to do so, he would put up the full $400,000 for JD on his behalf that day and that JD could simply pay him back as soon as possible out of the funds MILLS told JD he would receive as a result of Cisco's impending purchase of Motionloft, which MILLS told JD would close on or about December 13, 2013. MILLS also told JD that Cisco's good faith nonrefundable ten percent payment of $76,000,000 had already been received by Motionloft and that it guaranteed JD three percent of $76,000,000 in the very near term.

8. JD transferred $10,000 from his Florida-based Bank of America account ending in 4454 to a Bank of America account ending in 3154 MILLS told him he held with his girlfriend "SD" (these are the initials of the individual, not the individual's real name) on November 27, 2013. JD told me he provided MILLS with this $10,000 good faith deposit because he was unable to transfer the full $210,000 on November 27th because his bank in Florida was closed at the time.

9. JD transferred the remaining $200,000 from his account ending in 4454 to MILLS's account ending in 3154 on November 29, 2013.

10. JD communicated with MILLS verbally and via text message several times between the time he sent MILLS $210,000 and when he finally obtained a written contract regarding his investment from MILLS. MILLS repeatedly confirmed with JD that the Cisco buyout was imminent, but was taking longer than MILLS initially believed for various administrative reasons.

11. On December 21, 2013, MILLS finally delivered a signed copy of a Convertible Promissory Note from Motionloft to JD outlining the contract and JD's purchase of shares "equal to 3% of equity" of Motionloft. The contract was signed by MILLS as the CEO of Motionloft.

12. JD never received shares of Motionloft as promised by MILLS. JD has never received any funds of any kind for his purported investment in Motionloft.

13. Motionloft's largest investor is Radical Investments, a Delaware based limited partnership wholly owned by "MC" (these are the initials of the individual, not the individual's real name). I have reviewed emails exchanged between MC and an attorney associated with JD regarding JD's purported purchase of Motionloft shares from MILLS. In the emails MC confirms that Motionloft never had a "deal" with Cisco. MC advises the attorney to "meet jon and confront him on getting paid back." MC further advised the attorney via email that "We have heard from several of his victims and the last unsolicited email I got from Mills was saying he was trying to pay his victims back."

14. In January 2014, I communicated with the Director of Legal Services of Cisco, who advised me that he had no knowledge of any possible acquisition of Motionloft. In addition, he informed me that he checked with several members of Cisco's mergers and acquisitions group, and that those individuals similarly communicated that they had no knowledge of any possible acquisition of Motionloft.

15. JD has confronted MILLS several times, both orally and via text message, regarding MILLS's scheme to defraud JD. On December 30, 2013, JD sent MILLS the following text message: "Jon, as a follow up to your guarantee this past Friday that the money you defrauded from me would be returned, in full, to my bank account no later than tomorrow (12/31), by noon, I want to be clear: if you do not do as you promised, my attorney and I will be filing a police report re" your criminal actions, and I will be pressing charges against you and presenting the police with the mountain of evidence we've complied. No excuses or exceptions." MILLS responded several minutes later with the following messages "you won't have to do any such thing." And "Just don't ruin my reputation with the people I work with and know until I can get this back to you."

16. JD told me that over the course of several weeks at the end of December 2013 he engaged in multiple conversations and text message exchanges with MILLS during which MILLS apologized for taking JD's money and promised to return it. JD threatened to report JD to the police on multiple occasions, and MILLS responded with promises to repay JD back on each occasion. JD told me MILLS repeatedly pleaded with JD asking JD not to report him to the police and promising to repay JD his initial investment.

## Wire Transfer

17. On or about November 27, 2013, JD, while in Florida, caused an online transfer of $10,000 to be wired from JD's account number ending in 4454 at Bank of America to MILLS's girlfriend SD's account number ending in 3154 at Bank of America opened in California.

## C. CONCLUSION

18. Based upon the foregoing, I believe there is probable cause to believe that MILLS has conducted a scheme to commit wire fraud, in violation of Title 18, United States Code, Section 1343. Accordingly, I respectfully request an arrest warrant for MILLS.

## D. REQUEST FOR SEALING

19. Because this investigation is continuing, and because the arrest will take place after this Affidavit is executed, I believe that disclosure of this Affidavit, the Criminal Complaint, or the Arrest Warrant would jeopardize the progress of the investigation. Accordingly, I request that the Court issue an order that the entire file in this matter be sealed until further order of the Court.

BRIAN C. WEBER
Special Agent, Federal Bureau of Investigation

Sworn to and subscribed before me
This ___th day of February 2014

MARIA-ELENA JAMES
United States Magistrate Judge

4